IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2020

## STATE OF TENNESSEE v. PATRICK PHILLIPS

**Appeal from the Criminal Court for Shelby County**
No. 13-03536     W. Mark Ward, Judge
_____

### No. W2019-02004-CCA-R3-CD
_____

A Shelby County jury convicted the defendant, Patrick Phillips, of rape of a child and aggravated sexual battery. Following a sentencing hearing, the trial court imposed an effective sentence of twenty-seven years in confinement. On appeal, the defendant challenges the sufficiency of the evidence to support his convictions and argues the trial court erred in denying his motion for new trial based on the State's failure to answer the defendant's motion for a bill of particulars. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and ROBERT H. MONTGOMERY, JR., JJ., joined.

Monica A. Timmerman, Bartlett, Tennessee (on appeal) and Ralph T. Gibson, Memphis, Tennessee (at trial), for the appellant, Patrick Phillips.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Devon Lepeard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On August 1, 2013, a Shelby County Grand Jury indicted the defendant for rape of a child and aggravated sexual battery. The defendant was charged with abusing K.W., the

daughter of his girlfriend.[1]  The victim, who was born in October 2000, was seventeen years old at the time of trial.

The allegations against the defendant arose in November 2012.  At the time, the victim and her siblings lived with their father in Greenwood, Mississippi, during the school week and visited their mother at the home she shared with the defendant in Bartlett, Tennessee, on the weekends and during school breaks.  The victim, who was twelve years old at the time, and her siblings stayed with their mother and the defendant during the weekend of November 2-4, 2012.  Because the victim's mother worked at night, the defendant was responsible for watching the victim and her siblings from approximately 10:15 p.m. until 7:00 a.m.

One night that weekend and after her mother left for work, the victim was in her mother's bed watching television when the defendant began giving her a massage. Although the defendant had given the victim back massages in the past with the victim's mother present, the victim's mother had told the defendant not to massage the victim anymore because it "was crossing the line."  However, this time, in addition to massaging the victim's lower back, the defendant also rubbed the victim's buttocks.  During the massage, the victim fell asleep, and when she awoke, she was "half dressed in a weird position."  The victim's sweatpants were off, and she was lying face down on the bed with her knees bent and her waist in the air.  The defendant, who was behind the victim, "put his mouth on [her] private part" and digitally penetrated her vagina.  The victim was afraid and told the defendant to stop, but he continued assaulting her.  After he was finished, the defendant went into the bathroom and returned with a box of tissues.  The defendant then attempted to vaginally penetrate the victim with his penis but was unable to fully penetrate her.  During this time, the defendant would occasionally use the tissues to "wipe whatever liquid was there."  After approximately ten minutes, the defendant "gave up" and returned to bathroom, and the victim ran to her bedroom.

The victim did not initially tell her mother about the assault because she was worried her mother would not believe her.  Instead, the victim wrote her mother a note explaining what had happened and placed it in her mother's purse.  However, the victim's mother did not find the note until January 5, 2013, after cleaning out her purse.  Because the note was not found until two months after the assault, the victim was around the defendant several times in November and December.  During that time, the victim tried to act as normal as possible in the defendant's presence because she did not want to "start a conflict" between the defendant and the victim's mother.  Upon discovering the note, the victim's mother immediately went to Mississippi to meet with her ex-husband and the victim, and after the

---

[1] It is the policy of this Court to refer to victims of sexual abuse by their initials.  For purposes of this opinion, "the victim" will refer to K.W. unless otherwise noted.

victim told her parents what the defendant had done, they drove to the Bartlett Police Department ("BPD") to file a police report.

Following the initial report, Detective Rebeka Anderson with the BPD's Investigative Citizens Division was assigned to the victim's case. Detective Anderson coordinated with the Memphis Child Advocacy Center to schedule a forensic examination of the victim, which was conducted on January 25, 2013, by forensic interviewer Letitia Cole. While only Ms. Cole and the victim were in the interview room, Detective Anderson observed the interview via closed circuit television. The victim's forensic interview was played for the jury and entered into evidence.[2]

The victim also underwent two physical examinations. The first exam at Greenwood Children's Clinic on January 22, 2013, revealed that the victim's hymen was not intact, and the victim was referred to The Children's Safe Center of Mississippi ("the Safe Center") for a second exam.

Dr. Scott Benton, an expert in pediatric forensic medicine and the medical director of the Safe Center, reviewed the findings of the victim's second physical exam which was performed at the Safe Center on February 1, 2013. Although the victim's physical exam was normal, Dr. Benton noted the length of time between the incident and exam and stated, if the victim had suffered injuries during the abuse, "[t]ime definitely has an ability to heal that type of skin." Dr. Benton also opined that the results of the victim's first exam at Greenwood Children's Clinic were misinterpreted and that the victim's hymen was "most likely" intact at the time of both exams.

Following her discovery of the note, the victim's mother confronted the defendant through text messages. The defendant admitted to giving the victim a massage and told the victim's mother "he felt bad for doing it." At trial, the victim's mother testified the defendant knew which date the victim was talking about because it was the same night the victim's mother accused the defendant of not responding to her text messages. After the defendant was made aware of the victim's allegations, he left the house he shared with the victim's mother, and she was unable to reach him for several days. The defendant eventually reinitiated contact with the victim's mother, and because she was afraid he would leave the area again, she pretended to remain in a romantic relationship with him. She also continued having sexual relations with the defendant and told him that she did not believe the victim's allegations. However, at the same time, she was in contact with Detective Anderson, advising her of the defendant's contact information and whereabouts.

---

[2] Although the forensic interview was entered into evidence, none of the trial exhibits were made a part of the record on appeal.

Detective Anderson told the victim's mother to be cautious in her interactions with the defendant and not to put herself in harm's way.

At trial, the State called the victim, the victim's mother, the victim's father, Dr. Scott Benton, Detective Rebeka Anderson, and Letitia Cole as witnesses, and all rendered testimony consistent with the foregoing. On cross-examination, the victim agreed the note to her mother was dated November 6, 2012, and because that was a Tuesday, the victim would have been in Mississippi on that date. However, the victim testified the 6th was an approximate date, and while she knew the assault occurred in November, she could not narrow it down to a specific date.

The defendant called Kimberly Carter, Ms. Carter's granddaughter, A.T.,[3] and Vora Lewis as witnesses. Kimberly Carter, a friend of the defendant, testified that from March to June 2012, she often babysat for the victim and her siblings when they stayed at the defendant's house. Ms. Carter testified the victim was "not very honest" and lied about household rules such as when she was supposed to go to sleep or what television programs she was allowed to watch. The victim also went into the defendant's music studio, which was off-limits to the children. After the victim's cell phone was taken away, Ms. Carter testified the victim became "extremely angry" and "very disillusioned" with the defendant. Ms. Carter stated she held the defendant in "extremely high regard" and never saw him act inappropriately toward children. On cross-examination, Ms. Carter testified the victim's cell phone was taken away in May and admitted she was not around the house in November when the abuse occurred.

A. T., who was twelve years old at the time of trial, testified she would often accompany her grandmother to the defendant's house when her grandmother babysat for the victim and her siblings. A.T. testified the victim's reputation for honesty was "very poor." According to A.T., the victim would watch inappropriate videos and go into the defendant's studio when he was not home. When the victim's cell phone was taken away, she acted as if the defendant "was this evil being because he disciplined her." A.T. testified she never saw the defendant do anything inappropriate. On cross-examination, A.T. admitted she had not been around the defendant or the victim since A.T. was five years old.

Vora Lewis met the defendant in August 2011 when they attended Belhaven University together. In December 2012, Ms. Lewis was hospitalized, and the defendant and the victim's mother brought the victim and her siblings to the hospital to visit Ms. Lewis. During the visit, the defendant and the victim interacted and "looked natural." The victim was smiling and laughing, and she did not "appear to be in any type of trauma."

---

[3] It is the policy of this Court to refer to minors by their initials.

Ms. Lewis testified the defendant's "character for honesty is absolutely commendable," and she had never seen him be dishonest or act inappropriately around women or children. On cross-examination, Ms. Lewis acknowledged she did not know the victim prior to the hospital visit and admitted she did not have training in child psychology or trauma reactions.

The defendant testified on his own behalf, stating he met the victim's mother in October 2011. After they began living together in early March 2012, the victim and her siblings would stay at their house on the weekends and during school breaks. Initially, the defendant believed his relationship with the victim was "awesome." Although the defendant helped to enforce household rules, the victim's mother was in charge of administering any discipline. However, as time went on, the defendant became aware that the victim was lying and breaking the rules. Specifically, as the defendant was examining the victim's cell phone bill, he noticed several phone numbers that were not associated with family members and took the victim's cell phone away.

Regarding the massages, the defendant testified he and the victim's mother received a couple's massage in April 2012 for his birthday. After telling the children about the massages, they were "curious," so the defendant and the victim's mother showed them some of techniques. In June 2012, the defendant gave the victim a second massage in the presence of her mother. The defendant testified he was never alone with the victim in his bedroom for any reason and did not rape, molest, or fondle the victim in any way.

In January 2013, the defendant was at work when he received a text message from the victim's mother stating the victim had accused the defendant of rape. Because he "fear[ed for] his safety," the defendant went to Louisiana to visit his father for a few days. After returning to Memphis, the defendant stayed at the house he shared with the victim's mother finding an apartment in March. During this time, the defendant remained in a romantic relationship with the victim's mother. However, the relationship ended, in part, because the victim's mother refused to finalize her divorce from the victim's father.

At one point, the defendant went to Bartlett City Court for a speeding ticket and saw Detective Anderson. She approached the defendant, who stated he would only speak to her with his attorney present. Although the defendant gave Detective Anderson the name of his attorney, the defendant was never contacted to set up an interview.

On cross-examination, the defendant agreed he often watched the children while the victim's mother worked overnight, and in November 2012, the children stayed at his house on the first weekend of the month and during Thanksgiving break. Although it was common for the defendant and the victim's mother to text each other while the victim's mother was at work, the defendant stated he sometimes fell asleep and would not answer

her texts. He agreed there was a gap in his responses to the victim's mother from 11:50 p.m. until 6:00 a.m. on the night of November 3th and morning of November 4th. The defendant also admitted to giving the victim a massage that weekend. However, he stated that he gave her the massage early in the evening before the victim's mother went to work and that the victim's mother was present during the massage. Additionally, the defendant acknowledged he was previously charged with simple possession of marijuana but stated the charge was dismissed.

In rebuttal, the State offered testimony from Berenika Brown, who testified she had been in a relationship with the victim's father since 2010 and was around the victim on a daily basis. Ms. Brown testified she had never had a problem with the victim because she was a "good kid." Ms. Brown also stated the victim did not complain or argue when she was punished. The victim's mother and the defendant also testified in rebuttal. The victim's mother testified she had only seen the defendant give the victim one massage, and it was approximately a month before the incident. She denied discussing the couple's massage with the children or demonstrating massage techniques with the defendant. The defendant testified he, the victim's mother, and the children watched a movie on November 2, 2012, and the defendant gave the victim a massage on his bed in front of the victim's mother and the other children.

Following deliberations, the jury found the defendant guilty of rape of a child and aggravated sexual battery, and the trial court subsequently sentenced the defendant to an effective sentence of twenty-seven years in confinement at 100 percent.[4] The defendant filed a motion for new trial, arguing, in part, the indictment was defective due to lack of specificity as to the date and time of the crime; the State should have amended its bill of particulars to allege the crime occurred on November 2nd; and the evidence was insufficient to support his convictions. The trial court denied the motion for new trial, and this timely appeal followed.

### *Analysis*

On appeal, the defendant argues the evidence presented at trial was insufficient to support his convictions. The defendant also contends the trial court erred in denying his motion for new trial based on the State's failure to answer the defendant's motion for a bill of particulars. The State contends that the evidence is sufficient and that the trial court properly rejected the defendant's claim that the State failed to provide an adequate bill of particulars.

---

[4] Although it appears the transcript of the trial proceedings is six volumes, volume six was not made a part of the record on appeal.

## I.     Bill of Particulars

The defendant argues the State failed to answer his motion for a bill of particulars, and therefore, the trial court should have granted his motion for new trial.  However, a review of the record, specifically the defendant's amended motion for new trial and his argument during the hearing on his motion for new trial, reveals that the State did file a bill of particulars.  Therefore, the defendant's claim is without merit, and he is not entitled to relief.

Tennessee Rule of Criminal Procedure 7(c) provides that "[o]n defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged."  The bill of particulars is intended to "provide information about the details of the charge when necessary for a defendant to prepare his or her defense, to avoid prejudicial surprise at trial, and to enable the defendant to preserve a plea of double jeopardy." *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997).  In the bill of particulars, the State may be required to include information pertaining to the nature, time, date, or location of the offense. *Id.*  In the event the State is unable to provide an approximate time or date of the alleged offense, a lack of specificity will not result in reversible error unless the defendant can prove prejudice. *Id.* at 601.

The instant indictments allege the offenses were committed between March 1, 2012 and January 9, 2013.  The defendant filed a pretrial motion for a bill of particulars, requesting the exact date, time, and location of the offenses and acts alleged to have been committed.  Although the record does not contain the order granting the defendant's motion or the State's response, trial counsel made several references to the State's bill of particulars in the defendant's motion for new trial.  More specifically, in his amended motion for new trial, the defendant noted:

> 2. Attached hereto as Exhibit 1[5] is copy of the State's Response to Defendant's Motion for Bill of Particulars.  Paragraph 1 of the foregoing Bill of Particulars states:
>> As to the exact date and time of offenses alleged in each count of the Indictment, it is not possible for the State to give an exact date, due to the child's memory, but the time frame can be narrowed to the range of dates listed in the Indictment.  The child-victim will testify that the offense occurred on a day in November 2012.

---

[5] The exhibits to the defendant's amended motion for new trial were not included in the record on appeal.

The defendant then concluded his motion by asking the trial court to award him a new trial "based on the State's failure to amend the Bill of Particulars" to provide the defendant with the exact date in November 2012. Additionally, the defendant's argument during the hearing on the motion for new trial tracks the language of his motion. At no point does the defendant ever claim the State failed to file a bill of particulars; rather, the defendant's entire argument was that the bill of particulars, despite reducing the time frame from ten months to one month, was not sufficient.

Contrary to the defendant's new claim that the State failed to file an amended motion for a bill of particulars, the record reveals the State complied with the trial court's order and filed a bill of particulars in which it narrowed the timeframe of the incident from ten months to one month. Accordingly, the defendant's claim is without merit, and he is not entitled to relief on this issue.

## II.    Sufficiency

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a

defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The jury convicted the defendant of one count of rape of a child and one count of aggravated sexual battery for his crimes against the victim. At the end of trial, the State elected the specific facts upon which it relied for each conviction. The State alleged the defendant committed rape of a child by giving the victim oral sex after the massage. The State alleged the defendant committed aggravated sexual battery by touching the victim's buttocks during the massage. The defendant contends the evidence is insufficient to support these convictions because they rest solely on the testimony of the victim, a witness whose "credibility was seriously called into question," absent any physical or forensic evidence. The State contends the victim's trial testimony alone was sufficient to support the defendant's convictions.

Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501 (7). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" and "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504 (a)(4). Sexual contact "includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501 (6).

Viewed in the light most favorable to the State, the proof at trial revealed the victim was in the defendant's bedroom watching television when he began to give her a massage. Although the defendant had previously given the victim a back massage, this time the defendant also rubbed the victim's buttocks. During the massage, the victim briefly fell asleep, and, when she woke up, she was partially undressed and lying on her stomach with her knees bent and her waist in the air. The defendant then "put his mouth on [the victim's] private part." The abuse occurred in November 2012 when the victim was twelve years old. The defendant denied raping the victim at trial. Based on this evidence, a rational jury could find rape of a child and aggravated sexual battery beyond a reasonable doubt.

Although the defendant argues the State failed to present any evidence to corroborate the victim's testimony, her testimony alone is sufficient to support the defendant's convictions. *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (stating a child victim's testimony regarding sexual contact can be sufficient to support a defendant's conviction). Moreover, questions regarding the victim's credibility and the weight and value to be given her testimony are to be determined by the trier of fact and not this Court. *State v. Bland*, 958 S.W.2d 659, 659 (Tenn. 1997). Through its finding of guilt, the jury accredited the testimony of the victim and rejected that of the defendant, and we will not disturb that finding on appeal. *Id.* The defendant is not entitled to relief on this issue.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE